Our next case is case number 415-0346, consolidated with 49 and 60. And for the appellant, we have Mr. Turner. And for the appellee, Mr. Specia, and I'm not sure if I'm pronouncing that right. Specia. Specia. Yes, thanks. You've been here many times, but it just escapes me every time. Thank you, Mr. Specia. You may proceed, counsel. Please support and counsel. There are three topics I'd like to discuss. And in a few months, it will be 40 years since the first time I argued in this court. This court's always been very respectful of counsel, all counsel in all cases. And if you have a question about something I should be addressing or you would like me to respond to, I'd rather be doing that than focusing on the three topics. I do not believe that the summary judgment decision was the subject matter of the remand, but I believe the decision on the summary judgment decision was held open until the remand proceedings occurred. And I'd like to briefly argue the summary judgment decision. A preliminary indication from this court is that because the landowners did not support their appraisal or written report produced in discovery by the valuation expert that they were calling, since it was unsupported by an affidavit, that that would be a near automatic reason for the summary judgment decision to be decided against the landowners. And I believe that's the preliminary indication from the court district, and it was the court district's decision in other cases that were nearly identical to this one that I had in the lower court. I wish to argue that topic very briefly. The summary judgment motion was raised to bar the real estate broker that was the valuation expert of the landowners, and in attempting to bar that expert, that appraisal was made the subject matter of the motion and made an exhibit of the motion by the condemned owner. And in the motion, the motion admits the existence of the report filed by the landowner's expert and admits that there's a dispute between what the landowner's expert says is the just compensation and what the condemner's experts conclude were just compensation. So the issue of just compensation was created by admission by the condemned owner and then resolved against the landowners when there's an admission that there is a dispute of just compensation and the dispute is based upon a written report filed by the landowner's expert. In that circumstance, I don't believe it's required that landowners submit an affidavit to say that the report that the condemned owner was relying upon was the report of the expert of the landowner's valuation expert because that was something admitted to by the condemned owner. It's especially not needed, an affidavit's not needed in a just compensation issue because the Illinois Constitution and the Imminent Domain Act prohibit just compensation decisions being made by a judge, by a motion. They're reserved for a jury. And in our response to the summary judgment motion in the little report, we reserve that right to have just compensation determined by a jury. Let me move on to the remand issues raised in the supplemental brief of the landowners. There are two issues there. There's a sanctions and there's a substantive issue, and that is the landowners' right to conduct discovery. I believe the case law is well settled by the Supreme Court and has been for decades. The decision by Justice Underwood is always given special regard by counsel in private practice in the counties where I practice mostly, which is primarily McLean County. And then in the Cicero Bank case, Department of Transportation versus the Bank of Cicero, the Supreme Court again held that the same rights that exist in conventional civil litigation with regard to discovery exist for a landowner and should be upheld. And that's basically what we think is appropriate here. That's especially true in a case of condemnation because the pleadings, the procedural underpinnings of the cases are distinctly unique and not at all like typical civil litigation. Counsel, on remand, you spent a good deal of your time talking about the need to pursue discovery with regard to the venture between Marathon Oil and IEPC, did you not? That would be one part of it, but I believe the topics that relate to Marathon are broader than that. I believe what would be included in that would be what Marathon is using the pipeline for, what type of oil they're using the pipeline for. Well, the day before you had this argument, this court decided Kurth 2. Yes. Which, it's a remarkable situation because I don't know of any, and I've been at this a long time, where we had a case that seemingly wasn't the same case but could hardly have been more on point since it involved the same pipeline and the same issues that had been raised about the supposed involvement of Marathon Oil. And we wrote in that case, It is no longer relevant which company benefits or to the extent to which any particular company benefits, despite landowners' claim, Marathon's involvement or the extent of that involvement was not relevant to determining whether the pipeline is primarily for the benefit, use, or enjoyment of the public. Thus, landowners' argument about Marathon's involvement is without merit. We conclude this involvement is not relevant. We conclude that the trial court did not err by denying landowners' discovery and request information on who would be using that pipeline. We added, just in case this wasn't sufficiently clear, Quote, any lawyer who hereafter makes arguments that we have rejected in this opinion would be exposing himself or herself to possible sanctions pursuant to Rule 137 or Rule 375 or both. In the face of that, you proceeded to argue about the involvement of Marathon Oil as if we had said nothing. No, I didn't. Not at all. First of all, Counsel, let me ask you a question, somewhat of a follow-up. I may have responded to that, though. Well, I think this might be part of it as well. Are you making a distinction between what you argued on remand and the notion that Marathon's involvement somehow impacted the notion that this was for public use? Well, the traverse issue that the landowners that I represent in this case wish to raise and to mitigate is contesting whether a public use exists for this pipeline. The users, per se, I would agree, don't have a whole lot to do about it, whether it's a public or private use. But Marathon is more than a simple user. It is an unprecedented dominant user. Why does that matter? We wrote in the earlier case that the government isn't going to be using pipelines and counting on private enterprise to use them. Why does it matter which company is going to be using the pipeline and to what extent? Well, if it's... Initially, the SACS pipeline was clearly a common carrier pipeline with multiple shippers. The sources were primarily from Canada, and there were a number of shippers. But the whole concept changed. The shipping volume was reduced down to what was needed by one shipper, Marathon. Marathon has the risk of loss in this case, which is an incident of ownership. It assumed that by guaranteeing that it would use the pipeline sufficiently so that it would be a worthwhile venture and not a loss venture. But the facts in CURR-2 are substantially different than the facts in this case. Even though I only had the benefit of CURR-2 decision for less than a day, in the oral argument there, it matches up considerably with the briefing that I filed in this case. I mentioned... Well, CURR-2 came out a day later, but then you had weeks before you continued to pursue it. No, after February 28th, the day that discovery was denied the landowners, there was no effort made by the landowners to pursue Traverse, to pursue the remand, to pursue anything in terms of filings with the court or in terms of arguments with the court. What I did was I went about trying to see if I could put together a Traverse claim without discovery, without really having a handle on what the facts were. Discovery is needed in condemnation because the pleadings don't state what the facts are. The pleadings don't state what the public purpose is. There are no facts supporting the public purpose in a condemnation complaint. That's learned through discovery, if it's not voluntarily provided by the condemned knower. Any information that exists in this case, but for one item, at the trial before the ICC, which revealed the percentage of shipping volume that Marathon has contracted for, other than that, all the other information about Marathon were taken from sentences only. And SEC filings and filings of Marathon are enbridged in their webpages. Mr. Mercer, so is it your position that at no point after Curth II came out, did you try to use the fact that Marathon was, not Marathon, I'm sorry, what is it? Marathon, yes, that Marathon's involvement was relevant to the public use and necessity presumptions? Had not made, did not do anything in the… So you never put forth that argument after Curth II came out? No, that's correct. After attempting to build a Traverse case without discovery, I then, the next filing made on this topic by the landowners, by me, was concession. I can't submit a Traverse case. I conceded it. I didn't make any bonds about it, and admitted that I couldn't make the case. And if you look at that argument, I even admitted that I thought the result was most likely going to be a decision adverse to the landowners, but I couldn't do anything because I didn't have any facts to go on. The public purpose had not been given to the landowners by the condemnor, and we were denied the opportunity to discover that. So what I filed that was complained about the most was a two-page discovery proposal. Page one was proposing some depositions. There can't be, when you propose a deposition, there can't be a false assertion or anything. I believe it says I'd like to take depositions on the following topics. I didn't even list who the individuals were because I have no idea who they are. I said they'd be corporate opponents that would be familiar with it. Page two was a list of some documents to produce, and I think two of the requests on page two had to do with Marathon. The rest of it had to do with other aspects of the pipeline. It didn't make any difference. Everything was denied by the lower court. It was in May of 2019 you filed your second traverse motion in which you argued that the written contract between Marathon and IAPC has not been disclosed and that you need these documents. It's not a traverse motion. That was a concession. It was in May of 2018, excuse me, and it said, I'm conceived. I cannot present evidence of a traverse. There's no reason to waste anybody's effort to do so. And I explained the reason was I was unable to conduct discovery. I want to ask you also about page 17 of your brief when you Can I answer? Go ahead. One more topic. The facts of CURR II are considerably different here. They did not go after the public purpose in CURR II. They were relying upon strictly the percentage of pipe used by Marathon. In our case, that's why even in the argument of discovery, when I discussed who the economic experts were, our traverse goes beyond a simple assertion of the percentage of pipeline being used exclusively by Marathon. There would be additional evidence. There have been two cases in the past 30 years where a crude oil pipeline was met face on with experts that asserted there was no public purpose, there was no public benefit from the pipelines. I discussed that in the discovery hearing on February 28th, and then I attached that, and it says clearly I'm not attaching this as evidence. I'm attaching this to illustrate what I'm not able, the sort of things I'm not able to build a case around because I don't have facts. And those two cases, those are the only two cases that I know of that exist in the state of Illinois where a crude oil pipeline was met face on by experts, economists saying there was no public purpose. One of those economists, you know, was a Nobel laureate. On page 17 of your brief, when you're talking about the imposition of sanctions by the trial court, you talk about how, I'm quoting now, an improper reliance on Kurth II was intentional. At this point, the lower court has exhausted the trial court's discretion under the law. The lower court is now making intentional, lawless decisions and personally attacking an attorney who has been continuously acting reasonably. The lower court's lawlessness was also likely created in collaboration with IEPC since other than in one hearing, February 28th, counsel for the landowners had not sought discovery regarding Marathon. No lower court would have entered the sanction order without some other agenda, and sadly, agendas are unlawful. You don't cite anything in support of any of this. Oh, yes, I do. Well, nothing in your brief. Yes, I do. And in that section, I explained that I filed a motion to reconsider where I specifically queried the trial court, are you aware of the fact that the discovery request that we filed was filed before the announcement of the Kurth II decision? I wanted to make sure. He knew he was retroactively applying Kurth II to filings that I made as an attorney on behalf of the landowners, and he confirmed he was. Specifically, can you explain about the sentence, that lower court's lawlessness was also likely created in collaboration with IEPC? Where is any support for what is really a shocking accusation about Judge Lawrence? Do you have any support in this record for making this claim? In the record, and it's not cited in the brief, there are instances where Judge Lawrence and the IEPC argument. Now, I also clarified in the reply brief that I wasn't making accusations against counsel. There's a history in this case where Marathon contacts parties involved in decision-making in the case, and the record is in the ICC. I'm the one who made the record. I cross-examined the Marathon representative to confirm that they were attempting to influence the ICC decision. Counsel, I want to be clear here. Your time is up. Do you have anything you want to cite in support of the claim that the lower court's lawlessness was also likely created in collaboration with IEPC? That's essentially alleging criminal conduct, is it not, by Judge Lawrence? Do you have anything you want to say about that? I believe that the record does support that. Okay. Thank you, counsel. I just want to say, I'm the only one. Counsel, just a moment. You're out of time, but you will have additional time on rebuttal. Thank you. I'm the only lawyer that's signed up for the lower court. Counsel, I'm going to ask you to have a seat. Thank you. I appreciate your cooperation. Mr. Spezia? Thank you. May I please report? My name is John Spezia. I'm here with my co-counsel. I have not previously introduced this. Jay Pancarsie has worked on all these cases with me. We, as you know, represent an extension pipeline company. I, too, have three issues that I'd like to talk to you today. I want to talk about with the court. The first one is the Travis issue. So, in its published temple decision, this court deferred its ultimate determination on the trial court's ruling on the traverse until after the remand proceedings. It's our position that the remand proceedings have now clearly shown that the trial court properly found that the discovery sought during the remand was irrelevant, because this court had ruled repeatedly, even back to January of 2016, when it struck marathon arguments from Attorney General Bruce. Mr. Spezia, I wanted to ask you about that, because I guess my question is this. If Mr. Turner had withdrawn his filings that day that you all stepped up for the hearing, the day after Kurth 2 had come out, do you believe that sanctions still would have been appropriate at the trial court level? You know, I think that at that point, I think that sanctions would have been appropriate. And explain to me why. Well, here's the thing. This court, in January of 2016, struck virtually the same discovery requests that were then put back into the record in the remand. So, I don't think that a reasonable lawyer would take that order as anything but a decision by this court that that discovery was not relevant. But there's way more than that. The court then decided to intervene in Kurth 3 and rejected all the private pipeline, specifically this private pipeline argument in Kurth 3. The court then issues Kurth 1, Monarch Farms, Temple, Hope. I mean, this court has issued numerous decisions that indicated that marathon and its involvement in this project was not relevant. And I think to bring it back into the trial court at that point would have been sanctionable. But it really doesn't matter because the day before the discovery hearing, this court issued Kurth 2. And Attorney Turner, we provided Attorney Turner with the decision. And unlike Attorney Plura in the Monarch Farms cases, who withdrew the marathon arguments, on February 28th, Attorney Turner doubled down. He didn't stop at that point. In fact, on February 28th, he verified the relevance of his marathon requests. Under Penalty Perjury 1111. And was it shaped in a different argument? Absolutely not. There's no difference to any of this. In fact, we've provided in the record instances where we've shown just a cut in pace of arguments. There's no- On the question that Justice Holder-White is getting to, on whether or not Mr. Turner pursued his marathon argument after Kurth 2 was decided, was this addressed specifically by Judge Lawrence on the question of sanctions? And he- Apparently, Mr. Turner is making the claim, why didn't he pursue it, and there was no basis for sanctions. And was that a subject of the hearing on sanctions before Judge Lawrence? And what did he say about it? My recollection is that Judge Lawrence, throughout the remand proceedings, repeatedly informed Attorney Turner that it was not going to tolerate relitigation of the marathon issues because they had already been decided by this court. I think that Judge Lawrence's written order makes it clear that the marathon issue was litigated by Attorney Turner, and marathon's involvement, I think he uses the words, to the bitter end. And we're here today, and we're still litigating about marathon. In fact, I grabbed Attorney Turner's brief to this court. This is after the remand. And I've circled, I mean, page after page where we're relitigating marathon's involvement. Can you give me an example? Sure. I have it in front of me. What is it? And before you do that, do these relate to whether or not marathon's involvement is relevant to the public use and necessity presumptions? That's right. Okay. These do. So if you look at page 7, it's probably the best example. Attorney Turner says, In plain sight, there is one dominant private benefit, accruing to the dominant shipper and co-owner of the project who contracted to have a significant exclusive shipping access to the exclusion of all others. He says, The written contractual provisions create marathon's co-ownership and exclusive shipping access. And he complains that they haven't been disclosed. He says, These things would confirm the existence of a private benefit, the scope of the private benefits being received by marathon. He argues that he's entitled to know the full extent of marathon's benefit. That's all on page 7. He says on page 8, he talks about the role of marathon as the co-owner and dominant shipper. Again, I'm sorry, that's page 8. Page 8. Marathon's interest in the pipeline and the shipping commitment has since been disclosed. We're talking about marathon's role, marathon's involvement in the project. And I would submit to the court that if you think about it, his good faith arguments were withdrawn in a trial court. His arguments about the width of the pipeline being withdrawn in a trial court. And we were left really with relitigating about marathon. And complaints that throughout the proceedings that Attorney Turner was entitled to marathon discovery. I don't think that any reasonable lawyer can make those arguments. After this court said- Well, by the way, let me just pause right there. I want to make sure I understand what you're saying and Mr. Turner's position. It seemed to me Mr. Turner was saying, almost kind of like he was musing about the difficulty of not being able to get marathon materials, but he never really pursued discovery of marathon materials. I think that's what he was saying. And let me get your response as to how that worked. Sure. There's a significant, I think that in Attorney Turner's filings, I would liken them to being in a washing machine. There's a significant rotation that happens with arguments. And he makes arguments and then runs away from them. And so what I would say is this. The notion that Attorney Turner did not seek discovery relating to marathon is contrary to the very remand discovery requests. The first one is for the deposition of a deponent from marathon, who's familiar with the joint venture regarding ownership, capital, and capital contributions made by marathon, the cost of operation paid by marathon, and all agreements- Pause right there. If I understood what Mr. Turner was saying, he was talking about, yeah, we want this, but we- I think putting his argument in the best context. We understand we can't get it, but we want it. And we should be able to get it, but we can't get it. As opposed to telling the trial judge, gee, we want this and we want discovery. I don't know if I stated this clearly, but I want to give you an opportunity to respond. One, have I characterized this correctly? And two, if I have, then what's your response to that? I think that maybe you've stated it as clearly as it could be. But the fact is that throughout the remand, Attorney Turner showed up virtually every time we were before the court. We provide the court with those dates. You talked about Justice Feigman. You talked about the day after CURT. May 29th, July 20th, August 31st, October 30th, December 4th, and again, January 17th of this year, there were always arguments about Marathon and complaints that the Marathon discovery would, in fact, if he was able to get that, he would prevail. I mean, I think we can all agree that when we showed up at the Stage 1, Attorney Turner had no evidence. He was given 90 days to present the evidence that he said that he had. And we showed up, and he said, I don't have any evidence. But he argued about Marathon. And his complaint at the Traverse at Stage 1 was that because he was improperly denied the Marathon discovery, he couldn't present at Stage 1. So, look, I don't think that there's any way to get around the fact that the entire Traverse was an effort to relitigate Marathon's work. Back to the first issue, I think it's clear that the court properly denied the discovery, and it's also clear that the court properly denied the Traverse after Stage 1, because, in fact, no evidence was presented. In his written order on sanctions, did Judge Lawrence conclude that Mr. Turner had improperly pursued this Marathon business even after being told there was no basis to do it? Yes. Yes, he did. Did Mr. Turner make the same sort of argument to Judge Lawrence on that point that he has now? Essentially. This has all been the same. Every argument has been that Attorney Turner is entitled to Marathon discovery. You know, if the court looks at the arguments that were made the day after Court 2, I don't think that we should overlook the fact that Attorney Turner, this is the day after, argued to the trial court, quote, There are virtually no limitations in remand discovery regarding Marathon. He says, quote, I don't think there are any limits in this case in discovery. The agreements between Marathon and Enbridge, the shipping percentages, exclusivity of use, all of those are the arguments that he was making to the court. Those are directly contrary to Curth 2, paragraph 49, and directly contrary to Temple, paragraph 99, and the repeated decisions by this court that talk about, in a heading, the limited scope of the traverse here. One other thing. I'm not sure I understood it, but perhaps you did. Mr. Turner was talking about how Curth 2's discussion on Marathon didn't apply because there are distinctions between the cases. I think that's what he was saying. What's your position on that? There's absolutely no distinction between these cases. You know, this court, in paragraph 57 of Curth 2, this court made it clear that, and I'm going to quote this to you, because I think this is important about these alleged distinctions. This court said, Marathon's involvement, or the extent of that involvement, was not relevant in determining whether the pipeline is primarily for the benefit, use, or enjoyment of the public. Thus, Landowner's argument about Marathon's involvement is without merit. This court made it clear that Marathon's involvement is not relevant to any of those issues. So I think what Attorney Turner is trying to do, he's trying to say, oh, wait a second. You see, I was arguing Marathon's shipping commitment as the benefit, and they were really focused on use. Of course, that also flies in the face of the fact that this court says in Curth 2, it notes itself that there are benefits that can be observed from underground pipelines. It specifically talks about that. But there is no distinction between Curth 2 and these particular cases. So I'd like to touch, if I could, on our request for Rule 375 sanctions. I think it's clear from now on the quotes that I've given the court out of the brief that's been filed here by Attorney Turner in this particular appeal that he is, in fact, still re-litigating the role of Marathon. And that is in direct contravention of this court's warning that any reasonable lawyer would appeal. And that Attorney Plura did, and withdrew his Marathon documents. So here we are again, litigating about Marathon's involvement after this court's warning. For that reason alone, Rule 375 sanctions are warranted. So what do you want for sanctions? Sure. I think that what we want is our fees for this appeal. That's what we want for sanctions. Did you ask for fees for your litigation at the trial level from Judge Lawrence? Yes, we did. And did he give you fees, or did he reduce your fees, which were claiming excess of, I think, $140,000 to a $25,000 sanction? Right? Am I correct? That's correct. You didn't appeal that, did you? You know, when we were here the last time, we fully understood the court's position on the judge's discretion, and so we decided not to appeal that. I think that the result of the reduction in the fees has been unfortunate, though. And I think that what this appeal has shown is that that reduction in fees has empowered a lawyer to take this thing to an even lower level. And Justice Stegman talked about these scurrilous allegations that have been made, not only about, and I know that the court was focused on Judge Lawrence, but I guess the inference here is that I'm a collaborator. Yeah, but that doesn't count. We're concerned about judges, not lawyers. Are those comments contemptuous or sanctionable, or is there a distinction? Well, I think they're both. I think that if you think about this, this court has recognized that there are at least two purposes for sanctions rules, I think 375 and 137. The first is to deter conduct in the future. Obviously, Judge Lawrence's $25,000 did nothing to deter conduct. The second is a penal nature, and I think that it's clear that these allegations that have been leveled against the trial judge, against my firm, collaborating with the trial judge, and Justice Stegman talks about these accusations are almost criminal. There's actually, at one point, Attorney Turner actually calls the, he says at page 18 of his 375 response, Judge Lawrence engaged in intentional conduct very closely to or equal to criminal conduct. And that's sanctionable. That's sanctionable by this court to stop this from happening again, but it's also sanctionable to punish a lawyer for writing this stuff down. I've sat here and listened. There's no basis for any of this. There's not even a reasonable inference for any of this. And I would like to point this out. These allegations about where he attacks Judge Lawrence's character should really be put in proper context. And here's the context, just a bit of history. This court has issued 13 written decisions arising out of the SACS pipeline project. Okay. Thanks for reminding us. Well, you know what? My client and I appreciate the time that the court put into this. But 13 written decisions. Five years of eminent domain litigation. Okay? Judge Lawrence had 44 cases on his docket. 21 of them were Attorney Turner's. And during that time, Attorney Turner wants to talk about reviving his summary judgment motion. And I welcome that if the court would address the substance of Dale Awkerly's opinions. Because think about what the trial court endured here from Attorney Turner. He disclosed an expert who gave value opinions, who wasn't even a licensed appraiser. One judge found that he could be guilty of a class A misdemeanor for doing that without a license. And those opinions are based on corn growing on trees, landowners needing evacuation plans due to their alleged fear of explosions, the type of information no reasonable lawyer would inject into litigation. And before Judge Lawrence decides that those opinions are admissible and grants summary judgment, you know what he does? He says this to Attorney Turner. This is right before he grants summary judgment. He says, quote, Are you asking to get additional opinions? If I were to grant the motion today, where would that put you? Would you have any intent on seeking a different opinion? So this is the flawed character that Attorney Turner talks about now, who opened the door to Attorney Turner getting additional opinions. And I was, how does this make any sense that I was collaborating with the judge who was going to give him the opportunity to get more opinions? Counsel, before you run out of time, you're right, there's a lot of these cases, and it's hard for me to remember everything that occurred in them. But you've mentioned a couple times that Attorney Plura withdrew after discovery rulings were made and did things differently than Mr. Turner did. But I recall he got sanctioned for $107,000 too, didn't he? He got sanctioned for $61,000. $61,000. That's right. By Judge Vinson? By Judge Vinson in the trial court. But I think that one of the differences there is that Attorney Plura's litigation in the circuit court of DeWitt County also included what the court found were, I believe found were, frivolous claims about the lack of good faith negotiations after huge offers had been made to his clients and repeated litigation about appraisal requirements that were contrary to Illinois Supreme Court precedent and various other things. But yes, all three of the lawyers who were involved in the SAX pipeline litigation for landowners have been sanctioned. This court sanctioned Attorney Wetzel for filing a frivolous appeal. Attorney Plura was sanctioned in DeWitt County, and Attorney Turner in McLean County. And his sanction in DeWitt was only for $60,000? $61,000. Right. Incidentally, this is in the briefing, but... Counsel, I'm sorry, you're out of time. Okay. Thank you. Thank you. Any rebuttals? Yes. Please, the Board of Counsel. Let's be clear. There was no effort made after February 28, 2018, to seek discovery from Marathon at any time in the remand. Nothing was filed. Nothing was argued about Marathon discovery. At the deadline for filing Stage 1 evidence, so the court could weigh whether or not there was going to be sufficient reason to go forward with a traverse, that topic was conceded. No ability to present traverse evidence was admitted to, both orally and in writing. At that point, the case could have come back to the appellate court. It didn't for several months after that. But it wasn't because of filings by the landowners or the landowners' counsel. All of the filings. And one was a two-page discovery request. It was filed February 6. Court 2 was announced February 27. The Temple remand decision allowed me, and it even references the fact that our main argument on traverse has to do with Marathon. The Temple decision authorized discovery on the Marathon topic. That was argued on February 28. The argument was lost, and nothing was done about that after that. Now, I believe it's appropriate under Supreme Court Rule 137 and 375 for a lawyer that's litigating in developing areas of the law to make arguments like we've made in our appellate briefs. For heaven's sakes. This court has not repealed the right of landowners to test the public purpose. And in order to do that, we have to know what the facts of the case are. The ICC decision doesn't have anything to do with the public purpose other than there's a presumption graded under the Imminent Domain Act that the ICC didn't determine there was a public purpose or wasn't a public purpose of the type that's used in determining whether a taking is proper under the Constitution. And, you know, that's why we believe it. Thank you. It looks like my time is up. I'd just like to say one more thing. When a judge knowingly applies retroactively a decision that was made on February 27, as the filings made on February 6, I think that's a very intentional act by the lower court. Thank you. Mr. Turner and Mr. Spatia, thank you very much. We'll take this matter under advisement and be in recess.